FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ DEC 30 2011
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
PASQUA D'AMORE,

       Plaintiff,

 - against -

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.
------------------------------------------------------------- X

**MEMORANDUM**
**DECISION AND ORDER**

11 Civ. 0350 (BMC)

**COGAN**, District Judge.

  Plaintiff *pro se* brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), seeking review of the determination of an Administrative Law Judge ("ALJ") that she is not disabled. Before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Plaintiff has not filed any opposition to this motion. For the reasons set forth below, the Commissioner's motion is denied, and the case is remanded for further proceedings consistent with this decision.

## BACKGROUND

  Plaintiff filed a Title II application for disability insurance benefits on March 3, 2008, alleging that from January 4, 1990 through June 30, 1995, the date last insured, she was disabled due to severe problems with her neck, back, left shoulder, left hip, left leg, left hand, and left foot. At the time of her application, plaintiff was 63 years old and understood limited English. She was educated through the fifth grade in her native country of Italy, and subsequently immigrated to the United States. From 1979 to 1985, plaintiff worked as a sewing machine operator, hand presser, and seamstress. From 1986 to 1990, she worked for two companies as a

factory assembler and packer, and she had two accidents while at work during this period. First, in May 1987, she fell and injured her left side. Second, in October 1988, she hit her head on a pipe while moving a box of tools. As a result of these injuries, plaintiff stopped working in January 1990 because she had pain "everywhere." She visited several doctors for treatment, and submitted medical records to the Social Security Administration detailing these visits. A summary of these records is set forth below.

### a. Medical Evidence Submitted to the ALJ

Plaintiff received treatment from an orthopedic surgeon, Dr. Alvin Bregman, beginning in March 1980. On April 3, 1989, Dr. Bregman noted in a workers' compensation report that plaintiff was totally disabled due to left cervical radiculopathy and pain in the left shoulder and neck. On September 11, 1990, Dr. Bregman noted that he was treating plaintiff for left cervical radiculopathy and left lumbar strain. Dr. Bregman also submitted a worker's compensation form for plaintiff at this time, stating that plaintiff complained of neck spasms and neck, head, and left upper extremity pain, and assessing plaintiff with "total disability."

Dr. Bregman submitted a second worker's compensation form on May 9, 1991 in which he diagnosed plaintiff with left cervical radiculopathy and left lumbar sprain and opined that she was totally disabled. Dr. Bregman noted that plaintiff complained of neck and back pain and cervical spasms, and stated that plaintiff's motor function was normal, her cervical flexion and extension was 40 to 110 degrees, with lateral rotation to 60 degrees bilaterally. He again assessed plaintiff as totally disabled in his May 5, 1992 worker's compensation form, noting that plaintiff had subacromial tenderness, and active abduction of the left shoulder to 120 degrees. He diagnosed left shoulder rotator cuff tendinitis and left cervical radiculopathy.

In a worker's compensation report dated November 24, 1992, Dr. Bregman assessed plaintiff with "partial disability." He noted that plaintiff's left shoulder abduction was to 90 degrees (active) and 100 degrees (passive), that she complained of left shoulder and neck pain, and that the drop test was positive. Dr. Bregman diagnosed left shoulder rotator cuff tendinitis and left cervical radiculopathy.

On March 4, 1993, Dr. Bregman submitted another form for worker's compensation, noting that plaintiff's active abduction of the left shoulder was to 90 degrees, and active flexion to 160 degrees. The drop arm test was positive, and plaintiff had normal ranges of motion in her neck and back. Straight leg raising was negative. Dr. Bregman diagnosed left shoulder rotator cuff tendinitis and assessed that plaintiff was capable of "light duty" work only.

Plaintiff obtained treatment from a chiropractor, Dr. Richard Matteo, from February 9, 1990 through November 20, 1995. During their first meeting, Dr. Matteo diagnosed left cervical radiculopathy after a cervical and foraminal compression test was positive, Tinel signs were positive, and plaintiff complained of cervical tenderness. Dr. Matteo subsequently reported diagnoses of cervical radiculitis, headaches, and cervicalgia, and assessed plaintiff with "total disability" in worker's compensation forms that he completed on behalf of plaintiff throughout the five years he treated her.

Plaintiff was examined by a neurologist, Dr. Carlisle St. Martin, on November 15, 1990. His examination of plaintiff's cervical spine revealed some discomfort with some paraspinal spasm bilaterally radiating towards her trapezius. Her sensory exam was unremarkable and her deep tendon reflexes were equal in the upper and lower extremities. Dr. St. Martin noted "rule out herniated cervical disc" and suggested testing to determine the existence of some disc

pathology. Dr. St. Martin also assessed "totally disability" for purposes of plaintiff's worker's compensation claim on March 8, 1991.[1]

On January 23, 1991, plaintiff visited Dr. Robert Karlan for a neurological evaluation. Her motor examination, including gait, strength and coordination, was unremarkable. Reflexes were present and equal, and there were no sensory deficits. Cranial nerves including fields, fundi, and eye movements were normal. Dr. Karlan's impression was that there was evidence of cervical radiculitis with no other neurologic abnormalities. He had previously found that plaintiff had suffered from post-concussion syndrome after her accident in 1988, but had conducted an electroencephalogram that revealed normal findings and concluded that there was no involvement of the nervous system.

Dr. Walter Bottizer conducted an MRI of plaintiff's cervical spine on January 24, 1992 which showed evidence of posterior ridging at cervical vertebrae four-five but was negative for frank disc herniation. The MRI also showed normal cervical lordosis, preserved vertebral body weight, no evidence of compression fractures, normal intervertebral disc spaces, and essentially unremarkable bone and intervertebral disc space signal characteristics.

X-rays of plaintiff's thoracic, lumbosacral, and cervical spine from February 19, 1996 (after the date last insured) revealed osteodegenerative changes and a loss of range of motion. An MRI of plaintiff's cervical spine from February 21, 1996 revealed anterior disc bulges at cervical vertebrae 4-5, 5-6, 6-7, and between her seventh cervical vertebrae and first thoracic vertebrae, and minimal posterior disc bulges at cervical vertebrae 4-5 and 5-6. There was a benign hemangioma at her seventh cervical vertebrae.

---

[1] Plaintiff submitted to the Appeals Council several additional worker's compensation forms submitted by Dr. St. Martin throughout 2000 and 2001, in which he also assessed plaintiff with total disability

4

### a. Plaintiff's Administrative Hearing

Plaintiff appeared with counsel before an ALJ on July 28, 2009 to challenge the Administration's denial of her benefits application. She testified that she stopped working in January 1990 because she had pain "everywhere," including her head, neck, left arm, leg, and shoulder, and suffered from headaches and dizziness. From the time she stopped working until 1995, she could sit for no more than ten to twenty minutes, stand no more than five minutes, and could walk no more than four to five blocks. Plaintiff testified that at the time of the hearing in 2009, she could not do anything, including cooking, shopping, cleaning or bathing herself; she could only sit down, get up, and walk two or three blocks. In response to the ALJ's questioning, she also stated that she went to Italy for three weeks in 2001 and 2005, and twice to Florida after 1995.

The ALJ then heard testimony from Dr. Edward Spindell, a board-certified orthopedic surgeon. Dr. Spindell stated that he found no indication of a disability lasting a year or more prior to December 1995, and that plaintiff's medical conditions did not constitute a "severe" impairment or combination of impairments under the Act. Plaintiff's attorney then attempted to question Dr. Spindell on the basis of his findings; however, the ALJ interrupted plaintiff's counsel on numerous occasions, telling him at various times to "go on to the next question" and that "the record speaks for itself," and preventing Dr. Spindell from answering certain questions by arguing to plaintiff's counsel that plaintiff had returned to work after her accidents and that the findings of Dr. Matteo were not quantified. The ALJ also asked Dr. Spindell several yes or no questions that suggested that the ALJ was skeptical of plaintiff's impairments.

In response to plaintiff's questioning, Dr. Spindell did acknowledge that Dr. Karlan had diagnosed plaintiff with mild cervical radiculitis. Nevertheless, he testified that Dr. Karlan's clinical findings did not corroborate this diagnosis because he reported no neurological deficits, weakness, atrophy, or sensory or reflex changes. Dr. Spindell also expressed an inability to read Dr. Matteo's notes, but stated that Dr. Matteo's finding of positive cervical and foraminal compression test was not explained with sufficient specificity as he did not report specific nerve root information. Dr. Spindell also declined to credit positive results in a head drop test, as these tests were not explained with sufficient detail. Finally, plaintiff's attorney attempted to question Dr. Spindell on Dr. Bregman's determination that plaintiff was totally disabled, but the ALJ interrupted this line of questioning because (1) Dr. Bregman's diagnosis was in the form of worker's compensation forms; (2) he did not document the reasons for his conclusion; and (3) his conclusion was inconsistent with other evidence in the file.

Plaintiff's attorney had previously relied on worker's compensation reports – referred to as C-4s – on several occasions during the hearing. Each time, the ALJ expressed frustration that these documents were only part of the worker's compensation package, and asked plaintiff's attorney whether there were independent medical examination reports ("IMEs") that corroborated plaintiff's disability. Plaintiff's attorney stated that he was unsure, but acknowledged that he did not have all the reports because there was a charge that plaintiff could not pay. Plaintiff's attorney asked the ALJ to subpoena the records from plaintiff's worker's compensation attorney, but the ALJ refused. The ALJ stated that plaintiff was not indigent and that "if [plaintiff] didn't want to pay for it, then I'm going to ignore the C4s." Despite protests from plaintiff's attorney, the ALJ ordered production of the records within three days after the hearing and stated that he would decide the case without them if they were not produced. Three

days later on July 31, 2009, plaintiff's attorney submitted various employment and worker's compensation documents, but no IMEs.

### b. The ALJ's Decision

On October 20, 2009, the ALJ denied plaintiff's application after finding that plaintiff did not suffer from severe impairments that significantly limited her ability to perform basic work-related activities for twelve consecutive months. The ALJ gave great weight to the findings of Dr. Karlan, and significant weight to the findings of Dr. Bottizer and Dr. Spindell, the sum of which, according to the ALJ, supported a conclusion that plaintiff was not disabled. The ALJ gave no weight to the opinions of treating physicians Bregman, St. Martin, and Matteo. In making this determination, he found that Dr. Bregman's and St. Martin's conclusions were inconsistent with their clinical findings and the objective evidence in the record. Specifically, the ALJ contrasted their findings to Dr. Karlan's, which indicate mild cervical radiculitis and a normal electroencephalogram and neurological exam, and to Dr. Bottizer's MRI, which was negative for evidence of disc herniation in plaintiff's neck. However, he also emphasized several times that Dr. Bregman's and St. Martin's assessments of total disability in the form of worker's compensation reports "were unaccompanied by the clinical examinations and objective testing upon which they were based," and thus were unsubstantiated and uncorroborated. Regarding Dr. Matteo's findings, the ALJ noted chiropractors are not "acceptable medical sources," and therefore their opinions "need not be assigned controlling weight." Again, however, he emphasized that Dr. Matteo's finding that plaintiff was unable to work was unsubstantiated and uncorroborated in deciding to afford Dr. Matteo's finding of total disability no weight.

Plaintiff appealed her unfavorable decision through counsel in a letter dated October 20, 2009. On November 3, 2009, plaintiff submitted the complete worker's compensation file to the

Appeals Council, which included IMEs. By letter to the Appeals Council dated September 8, 2010, plaintiff contended that the ALJ's decision was not based on substantial evidence and that the ALJ failed to fulfill his duty to fully develop the record. The Appeals Council declined to review the ALJ's determination on November 24, 2010, making the ALJ's determination the final decision of the Administration.

## DISCUSSION

### I.  The Legal Framework and Standard of Review

Disability benefits are available to anyone who is deemed "disabled" as that term is defined in 42 U.S.C. §§ 423(d) and 1382c. A person is "disabled" when "he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" consists of "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic technique." Id. at § 1382c(a)(3)(D).

"The burden of proving disability is on the claimant." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984). Nevertheless, in weighing the medical evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. § 416.927(d), which requires that the Commissioner give a treating physician's opinion "controlling weight" if her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(d)(2). Additionally, an ALJ may not reject a treating physician's diagnosis because supporting clinical or diagnostic evidence is not in the record, regardless of whether plaintiff is represented by

8

counsel. See Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998). Unlike trial judges, ALJs have an affirmative duty to develop a complete medical record before making a disability determination, in light of the non-adversarial nature of benefits proceedings. See Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008); Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Rosa, 168 F.3d at 79 n.5 (quoting Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996)).

In reviewing a disability benefit determination, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. See Schaal, 134 F.3d at 501. The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206 (1938)).

A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." Manago v. Barnhart, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). Remand is also appropriate when the ALJ has failed to fully develop the administrative record.

See Butts v. Barnhart, 388 F.3d 377, 385 (2d Cir. 2004); Rosa, 168 F.3d at 82-83 (internal quotation marks and citation omitted).

## II. Duty to Develop the Record

A review of the administrative record indicates that the ALJ failed to fulfill his duty to develop plaintiff's medical history by not taking any steps to determine whether objective tests and clinical findings supported plaintiff's treating physicians' assessments of total disability, and by denying plaintiff a fair opportunity to cross-examine the testifying medical expert at her administrative hearing. Viewed together, these errors prevented the development of a complete administrative record and require remand.

First, the ALJ erred by affording the total disability determinations of Drs. Bregman, St. Martin, and Matteo no weight because they "were unaccompanied by the clinical examinations and objecting testing upon which they were based," and therefore were "unsubstantiated and uncorroborated." A treating physician's failure to fully explain the basis of his findings does not necessarily mean that a sufficient explanation does not exist. See id at 80; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998). Thus, in the event an ALJ concludes that the opinions of a claimant's treating physicians lack support from objective clinical examinations, he must first take steps to develop the record before making a disability determination, and may not simply reject the opinions as unsupported. See Rosa, 168 F.3d at 79; Clark, 143 F.3d at 118; Duncan v. Astrue, No. 09-CV-4462, 2011 U.S. Dist. LEXIS 49833, at *69 (E.D.N.Y. May 6, 2011); Rivas v. Barnhart, No. 01 Civ. 3672, 2005 U.S. Dist. LEXIS 1114, at *66-67 (S.D.N.Y. Jan. 28, 2005); Cleveland v. Apfel, 99 F. Supp. 2d 374, 380 (S.D.N.Y. 2000). Apart from the ALJ's statement that "[e]very reasonable effort was made to develop the medical history of the claimant" in accordance with Second Circuit law, nothing in the ALJ's decision or the record

suggests that the ALJ made any attempt to determine whether clinical examinations and objective findings not in plaintiff's medical record supported these assessments. This was error.[2]

Although an ALJ need not seek additional information "when there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,'" Rosa, 168 F.3d at 79 n.5 (quoting Perez, 77 F.3d at 48), the ALJ's decision and the record before this Court establishes that the plaintiff's medical history was not fully developed in the instant case. Three of plaintiff's treating physicians concluded in worker's compensation forms that plaintiff was totally disabled as a result of cervical radiculopathy or other cervical impairment. However, the ALJ declined to afford these conclusions any weight because they were based on examinations that were not of record, and therefore it was unclear "how their findings were arrived at." Thus, the ALJ acknowledged that the record before him was potentially incomplete, as it did not include evidence from the underlying examinations that led plaintiff's treating physicians to conclude that she was disabled. Moreover, the ALJ's questioning of plaintiff's attorney at the hearing uncovered that plaintiff had not submitted the complete worker's compensation file because of the cost of obtaining the records from plaintiff's previous attorney. Plaintiff requested that the ALJ subpoena the files, but the ALJ refused. Instead, the ALJ ordered plaintiff to produce the complete file within three days, or he would ignore the worker's compensation reports altogether. When plaintiff was unable to submit the complete file within three days, the ALJ made his disability determination without it. Thus, the ALJ could not have reasonably believed that the administrative record was complete, and he should have taken steps

---

[2] While the treating physicians' assessments of "total disability" in the context of worker's compensation reports are not binding on the Social Security Administration, see 20 C.F.R. § 404.1504, these assessments nevertheless "put the ALJ on notice that there were potentially valid opinions relating to the disability of the plaintiff in the Social Security context." Blais v. Astrue, No. 08-CV-01223, 2010 U.S. Dist. LEXIS 57234, at *24 (N.D.N.Y. May 13,), report and recommendation adopted sub nom. Blais v. Comm'r of Soc. Sec. Admin., 2010 U.S. Dist. LEXIS 57243 (N.D.N.Y. June 10, 2010).

11

to determine whether the disability determinations of Drs. Bregman, St. Martin, and Matteo were supported by objective medical evidence.[3]

Second, I am troubled by the ALJ's adversarial approach to plaintiff and her attorney, which "has no place in a hearing to determine Social Security disability." Mira v. Astrue, No. 09-CV-2012, 2011 U.S. Dist. LEXIS 98848, at *46 (E.D.N.Y. Sep. 2, 2011); see also Burgess, 537 F.3d at 128 (noting the non-adversarial nature of disability benefits proceedings); Ginsburg v. Astrue, No. 05 CV 3696, 2008 U.S. Dist. LEXIS 63447, at *47 (E.D.N.Y. Aug. 18, 2008) (remanding due in part to plaintiff's inability to cross-examine medical expert). The most significant example of this was the ALJ's continual disruption of plaintiff's cross-examination of Dr. Spindell, which effectively prevented plaintiff from challenging the basis for Dr. Spindell's conclusion that plaintiff was not disabled. The ALJ repeatedly interrupted plaintiff's attorney by instructing him to "go on to the next question," and that "the record speaks for itself," and prevented Dr. Spindell from answering certain questions by asserting that the findings of plaintiff's treating physicians were not supported and that plaintiff had returned to work after her accidents. Further, he asked Dr. Spindell numerous leading questions that strongly implied that the ALJ had determined that plaintiff was not disabled, questions with which, based upon the tone of the hearing, Dr. Spindell unsurprisingly agreed. This conduct denied plaintiff the fair hearing to which she was entitled and prevented an adequate development of the record as to the nature of plaintiff's impairments and the reliability of Dr. Spindell's disability determination.

---

[3] Plaintiff's complete worker's compensation file became part of the administrative record when she submitted it to the Appeals Council on November 3, 2009. See Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996). While this file included additional worker's compensation reports from Drs. Matteo and St. Martin, as well as medical examination records from other doctors, the record remains unclear as to whether there are any outstanding medical records from these doctors. Thus, this Court has no way of knowing whether plaintiff's treating physicians had an objective medical basis for concluding that she was totally disabled.

Additionally, plaintiff's cross-examination of Dr. Spindell further highlighted the gaps in the record and the significance of the ALJ's failure to obtain additional evidence from plaintiff's treating physicians. After Dr. Spindell testified that there was no indication of nerve involvement in plaintiff's impairments, plaintiff questioned Dr. Spindell on the positive results of tests conducted by Drs. Matteo and/or Bregman, including a cervical and foraminal compression test[4] and a head drop test. Dr. Spindell answered that the record contained insufficient detail for him to evaluate these findings, and that these tests therefore did not factor into his determination that plaintiff was not disabled. Under these circumstances, the ALJ should have concluded that further development of plaintiff's medical history was required. However, not only did the ALJ fail to fulfill his duty by declining to give these findings any weight without further investigation, he compounded this error by affording significant weight to Dr. Spindell's determination that plaintiff was not disabled, a conclusion also based on an inadequately developed record. Accordingly, remand is required in this case.

---

[4] The Commissioner notes in its brief that a positive cervical and foraminal compression test indicates pressure on the nerve root.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is denied. The case is remanded to the Commissioner for further administrative proceedings consistent with this decision. The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
December 30, 2011